# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 13, 2009

Charles R. Fulbruge III
Clerk

No. 09-20174

ARTISAN/AMERICAN CORP., ALVIN MANOR, LTD., ALVIN MANOR ESTATES, LTD., and INLAND GENERAL CONSTRUCTION CO.,

Plaintiffs-Appellants

v.

CITY OF ALVIN, TEXAS

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM and STEWART, Circuit Judges, and *FELDMAN, District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Following the City of Alvin's refusal to permit a proposed low-income housing project, the developer, Artisan/American Corp., filed suit under the Fair Housing Act, alleging that the City's denial was motivated by racial animus and that it had a discriminatory impact on racial minorities, specifically Hispanics. The district court granted summary judgment for the City. We now AFFIRM.

**I**

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

Artisan/American and its sister companies (collectively "Artisan/American") proposed two developments, each with thirty-six residential rental units, to be built in the City of Alvin, Texas. Located twenty-five miles southeast of Houston, in northeast Brazoria County, the City is home to more than 22,000 residents, of whom between 28% and 45% are Hispanic.[2]

In January 2004, to secure funding for the project, Artisan/American applied to the Texas Department of Housing and Community Affairs for housing tax credits. The City opposed the application and, about two months after Artisan/American's application, submitted a resolution urging that the City already had a greater proportion of citizens receiving housing assistance than other cities in Brazoria County, and that the proposed development did not meet then-unspecified municipal building ordinances. Nevertheless, the Department of Housing and Community Affairs approved the application in June 2004 and notified the City of its decision. In April 2005, the City passed additional resolutions, using the same language as the first, opposing two other Artisan/American low-income housing developments.

Undeterred, Artisan/American sought a permit for the proposed project. The City held its first pre-development meeting with Artisan/American in April 2005. There, it informed Artisan/American's representative that the proposed location for the project would violate Section 31-7(e) of the municipal ordinances (the "Ordinance"), which proscribes placing an apartment project within 300 feet

---

[2] The 2000 U.S. Census indicates that 28.1% of Alvin's population is Hispanic, while Artisan/American's complaint asserts, and the district court assumed, that today, 45% is Hispanic.

of a single family residential dwelling.[3] The City then provided Artisan/American with a copy of the Ordinance. At this meeting, a city official took notes that indicate that when Artisan/American's representative asked, "What if we got a variance for the apartment project location?" the City replied, "You can ask but there was a resolution on this site not to do it."

Again at informal meetings with Artisan/American in June 2005 and January 2006, the City reiterated that the proposed project violated the Ordinance. At no time did Artisan/American seek a variance for the apparent violation.

During the second pre-development meeting in March 2006, the City, presented with preliminary plats, noted that the project continued to violate the Ordinance because it remained within 300 feet of a residential triplex that included at least two single family homes. At this meeting, Artisan/American offered to eliminate one development and to move the other farther from the triplex.[4] The remaining development would use the front part of the property, abutting a highway, as retail development, with a tenant-access road running through the middle. The City balked, saying that this proposal still violated

_____

[3]  City of Alvin, Ordinance § 31-7(e):

> No Apartment Project shall be located nearer than three hundred (300) feet to a single family residential dwelling unless it is also located within three hundred (300) feet of another apartment project. The measurement of the distance between the apartment project and single family residential dwelling or other apartment project shall be in a direct line from the property line of the apartment project to the property line of the single family residential dwelling or other apartment project."

[4]  Artisan/American claims this triplex was not a family dwelling but was used as a business. For support, it directs us to the declaration of Vernon R. Young, Jr., co-owner of Artisan/American Corp.

regulations because it did not provide adequate access from the complex to a public street.

The parties exchanged letters discussing the street issue throughout the summer of 2006, but to no avail. When Artisan/American suggested, as a compromise, that the City deem the access road a public street, thus excepting it from the development's bounds, the City refused. Doing so, argued the City, would create unnecessary expense while serving only the housing project.

In any event, according to a map provided by the City in August 2006, the project continued to have other problems. Not only was it within 300 feet of the triplex, it also stood within 300 feet of a mobile home park, in violation of the Ordinance. Artisan/American notes that this was the first time that the City mentioned the mobile home park.

Eventually the parties were able to resolve all of the City's objections to the project—including other violations of municipal regulations— except for the putative violation of the Ordinance. Still without municipal approval in February 2007, Artisan/American canceled the project, knowing it would not be completed before the state's tax credits expired on December 31, 2007.

Artisan/American later brought this lawsuit in district court, alleging that the City's actions in adopting or enforcing its 300-foot separation requirement had the purpose or effect of making housing unavailable to racial minorities, specifically Hispanics, in violation of the Fair Housing Act. The district court found summary judgment in favor of the City, Artisan/American now appeals, and this court employs the same standard of review as the district court.[5]

---

[5] *Whitt v. Stephens County*, 529 F.3d 278, 282 (5th Cir. 2008).

## II

The Federal Housing Act prohibits discrimination in the provision of housing.[6] We have recognized that a claim brought under the Act "may be established not only by proof of discriminatory intent, but also by proof of a significant discriminatory effect."[7] Following either avenue, Artisan/American's claim falls short.

### A. Discriminatory Intent

To survive summary judgment on its claim of discriminatory intent, Artisan/American must establish (1) a fact issue as to whether the City's stated reason for its decision—i.e., that the project violates the City's municipal ordinances—is pretextual *and* (2) a reasonable inference that race was a significant factor in the refusal.[8] The City's "refusal may have been unsound, unfair, or even unlawful, yet not have been violative of the [Fair Housing Act] if there is no evidence . . . that race was a significant factor in [the City's] decision."[9]

---

[6] 42 U.S.C. § 3601 et seq. (making it unlawful "[t]o . . . make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin"). Artisan/American also pursued a claim in the district court under the Texas Fair Housing Act, TEX. PROP. CODE, ch. 301, but apparently appeals under federal law only.

[7] *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986).

[8] *Simms*, 83 F.3d at 1556.

[9] *Id.*

*1. The City's Resolutions*

Artisan/American first points to the City's resolution opposing tax credits for the development, as well as the City's later opposition to Artisan/American's other proposed projects. For each project, the City's resolution stated that the proposed project in question "does not meet the City's building ordinances," that "one third of all the 'low-income' residents in Brazoria County that utilize housing vouchers currently reside in Alvin," that "in comparison with all the other cities in Brazoria County, the City currently has a higher percentage of citizens receiving housing assistance," and that "a new apartment complex with similar rental assistance programs recently opened for occupancy in late 2003."

Artisan/American notes that, at the time of the resolution, the City had not received plans or plats for the project and had not requested marketing studies, and the Texas Department of Housing and Community Affairs had not approved the project. Essentially, Artisan/American contends that the City acted hastily and without adequate information in voicing its opposition, and this speed belies the City's assertion of non-discriminatory purpose.

As an initial matter, we see no reason why plans, plats, or marketing studies would be necessary to determine that the project "does not meet the City's building ordinances"—at least as far as the ordinance at issue here is concerned; so long as the City knew *where* the project would be built, it could determine that the project was within 300 feet of single family housing. Artisan/American fails to convince that rejection of a specific project based on that basic knowledge is arbitrary or unreasonable. Moreover, there is no evidence that these resolutions constituted departures from the City's normal policy and procedure; no evidence that Artisan/American's tax application was

6

treated any differently, or addressed more quickly, than other projects submitted to the Department of Housing and Community Affairs; no evidence to suggest that a marketing study is normally prepared prior to a resolution supporting or opposing a project's tax credit application; and no evidence that the City's opposition of the tax credits affected its consideration of the project's permit. "The fundamental flaw," in the evidence that Artisan/American does put forth, is that it "offered it in a vacuum; [it] presented absolutely no evidence that other, 'non-protected' applicants or applications were treated any differently around the time of [Artisan/American's] rejection."[10] Without more, as the district court held, the speed with which the City responded is of no moment.

*2. The City's Interpretation of the Municipal Code*

Artisan/American also asserts that the City's interpretation of the Ordinance was unreasonable—and is thus evidence of discriminatory intent—because the City refused to deem the project's proposed access road a city street, excepting it from the project's bounds, and because the City treated the structures in the adjacent mobile home park as single family dwellings.

As previously discussed, when Artisan/American offered to change the project's design, it proposed moving the actual apartments farther away from the residential triplex. The City found that the change would not save the project from a violation, however, because the changes required the addition of an access road, and the access road would run from the side of the plot closest to the residential triplex. The City considered the access road a part of the apartment project, meaning that nothing had changed for purposes of the Ordinance, and

---

[10] *Id.* at 1558 (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 804 (1973)).

the project was still within 300 feet of the residential triplex. Artisan/American asserts that this interpretation is unreasonable, even though the ordinance states that the 300-foot measurement shall be to "the property line . . . of the apartment project." The City's reading draws the line to the beginning of any construction—e.g. the beginning of an apartment, road, etc. Artisan/American urges only that this "strict interpretation" is not "necessary" and has "nothing to do with the apparent purpose" of the Ordinance.

Of course, the City also rejected Artisan/American's application because the project stood within 300 feet of two plots of land containing "single family residential dwellings": a residential triplex and a mobile home park. Artisan/American urges that the "dilapidated mobile home park," and the mobile homes on it, are not single family dwellings, and the City's contrary interpretation is unreasonable. As Artisan/American sees it, to classify manufactured homes as "single family dwellings" is "not compelled by the language of the ordinance" and thus an unreasonable interpretation of the City's code.

We see no reason to disagree with the district court's determination that the City's interpretation was not unreasonable or arbitrary, assuming arguendo that evidence of unreasonableness—without a showing that non-protected applicants were treated differently—can do all that Artisan/American demands of it.[11] The City's code is muddled on this point, and provides ample support for either side. The Ordinance itself does not define "single family dwelling." Two

---

[11] *See Simms*, 83 F.3d at 1558 ("The fundamental flaw in [the plaintiff's evidence of arbitrary and unreasonable conduct] is that . . . he presented absolutely no evidence that other, 'non-protected' applicants or applications were treated any differently around the time of [the plaintiff]'s rejection.").

*different* definitions are, however, provided elsewhere in the municipal code: "a house or any other site built building used for single family residential purposes,"[12] or, alternatively, a dwelling "to be occupied by one family."[13]

City ordinances also define "manufactured home park" as an area that "contains four or more manufactured home spaces that are offered for rent."[14] "Manufactured home" is defined as a "structure . . . transportable in one or more sections . . . which is . . . designed to be used as a dwelling."[15] It is undisputed that a manufactured home is a "dwelling."

Although Artisan/American argues that a structure cannot be both "transportable"—as a "manufactured home" must—and "site built"—as arguably required of a "single family home" by one of the code's two definitions; thus, so says Artisan/American, a manufactured home cannot be a "single family dwelling." Artisan/American does not, however, contend that a manufactured home is designed for use by more than one family at a time—in contrast to an apartment or condominium building. We are not convinced that a "manufactured home" cannot qualify as a dwelling "to be occupied by one family" and thus cannot say that the City's interpretation was unreasonable.

That the Ordinance might be intended to preserve the property values of single family homes, or that the City's interpretation may not be the only—or even the best—interpretation, does not demand a different result. While a new

---

[12] Alvin Code of Ordinances § 34-1.

[13] *Id.* at § 24½-89.

[14] *Id.* at § 24½-4.

[15] *Id.*

apartment complex might actually improve the value of a manufactured home park, nothing in the record indicates that the City's decision was based on anything other than a reasonable (if literal) interpretation of a convoluted municipal code.

Even if a fact issue does exist as to whether the City is relying on a claimed violation of the Ordinance as mere pretext, Artisan/American has offered no evidence to support a reasonable inference that race was a significant factor.[16]  Artisan/American instead relies solely on the assertion of Vernon R. Young, Jr., Artisan/American's co-owner, that a former city council member told him that one or more other city council members uttered words to the effect that "we don't want those people here" and "we already have enough of those people here."  No city council member has come forward in support of this assertion, nor has any other person who might have heard these remarks firsthand.  There is, then, insufficient summary judgment evidence to support a reasonable inference of racial animus.

## B.  Discriminatory Effect

Likewise, Artisan/American cannot demonstrate a genuine issue of material fact as to "significant discriminatory effect."  Artisan/American urges that its expert produced statistics that show that in Alvin, as in other areas, racial minorities are more likely to rent apartments and are more likely to qualify for low-income housing.  To that end, it points to three salient pieces of summary judgment evidence: an expert report that concludes that minorities are more likely to rent in general, the affidavit of Artisan/American's owner

---

[16]  *Simms*, 83 F.3d at 1556.

explaining that Alvin has a need for low-income housing, and the fact that the state approved Artisan/American's tax credit application.

As the district court explained, however, "[Artisan/American does] not provide any analysis of the racial make-up of the relevant income pool who might have occupied [the actual project]" and "the City presented unrefuted evidence that there are many other sites on which apartments may be constructed within the city, including sites next to the proposed . . . site."[17] Moreover, the court found that the fact that "most of the low-income housing in Brazoria County is located in the City suggest[s] that there is no shortage."[18] Unlike those cases in which disparate impact has been found—each involving a waiting list for affordable housing or a demonstrated shortage of affordable housing—Artisan/American has not presented evidence of a waiting list or identified anyone affected by the denial of the permit.[19] While Artisan/American does point to its successful application for state tax credits, it fails to explain how the state reached its decision or on what criteria the decision was based. We must agree with the district court, then, that Artisan/American has presented no evidence that there is a shortage of low-income housing, or that anyone

---

[17] *Artisan/American v. City of Alvin*, No. 4:07-cv-2899, at *17 (S.D. Tex Nov. 19, 2008). Considering the City's opposition to Artisan/American's tax-credit financing for two other low-income housing projects, Artisan/American essentially argues that the City has a de facto policy of preventing *any* new low-income housing, and that this will disproportionately affect racial minorities who are more likely to need and use such housing. Artisan/American has not, however, alleged an Fair Housing Act claim against the City for the city council's action in opposing the tax credit financing for those projects.

[18] *Id.* at *17–18.

[19] *See Hallmark Developers, Inc. v. Fulton County, Ga.*, 466 F.3d 1276, 1287 (11th Cir. 2006) (citing cases); *see also Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir. 1988), *aff'd* 488 U.S. 15 (1988).

waiting for low-income housing was affected by the denial of the permit sufficient to raise an issue of material fact.[20]

In arguing that there is a need for affordable housing among the City's Hispanic community, Artisan/American rests entirely on conclusory analytics of highly-generalized data, and a citation to a successful state tax credits application, without the slightest indication as to how the state reached its decision. Without more, Artisan/American fails to raise a fact question as to whether the City's actions caused a significant discriminatory effect.

_____

Because Artisan/American fails to raise a genuine issue of material fact as to whether the City's actions were motivated by discriminatory intent or caused a significant discriminatory effect, we AFFIRM the district court's grant of summary judgment to the City of Alvin.

---

[20] The district court also concluded that Artisan/American could not prove that the City's actions furthered racial segregation because it had not provided evidence that minorities lived in particular areas of town, or that the project would exacerbate such a trend, if it existed. *See Huntington Branch NAACP*, 844 F.2d at 937–38 (holding that a zoning practice impermissibly encourages segregation if it limits all private, multi-family dwellings to an area of town with a high minority concentration in a town with a shortage of rental housing for low and moderate-income households). Indeed, it is undisputed that Alvin has a higher percentage of low-income housing than surrounding Brazoria County, evidence that, if anything, racial minorities are already concentrated *in* Alvin and that additional low-income developments would *further* this trend. *Cf. Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 568 (N.D. Tex. 2000) (finding that zoning that has had the effect of excluding nearly all minorities from an area—when surrounding areas have much higher percentages of minorities—is evidence that the municipality is not "sharing its obligation to provide fair housing" and "hiding behinds its exclusive zoning practices," which "compel[] neighboring communities to assume its obligation.").