# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 12, 2016

Lyle W. Cayce
Clerk

No. 15-60051

ANGELA ANDERSON, Personally, and on Behalf of the Wrongful Death
Beneficiaries of Princess Anderson, Deceased,

      Plaintiff - Appellant

v.

MARSHALL COUNTY, MISSISSIPPI; BAPTIST MEMORIAL HOSPITAL -
DESOTO,

      Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:12-CV-92

Before JOLLY, HAYNES, and COSTA, Circuit Judges.

PER CURIAM:*

Angela Anderson's daughter, Princess Anderson, was found in critical
condition while in police custody in Marshall County; shortly afterwards, she
died of multisystem organ failure. Anderson sued Marshall County and its
Sheriff for violating Princess's rights under 42 U.S.C. § 1983; she also sued a
hospital that had released Princess without treatment earlier that day for

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 15-60051

medical malpractice.  The district court determined that there was no § 1983 violation.  Having made that determination, the district court declined to exercise supplemental jurisdiction over Anderson's state law claims and dismissed those claims.  For the following reasons, we affirm.

I.

On the morning of February 7, 2011, Princess arrived at the emergency room at Baptist Memorial Hospital in Collierville, Tennessee, complaining of nausea and vomiting.  Emergency room staff determined that Princess was pregnant, and an ultrasound examination revealed the possibility of an ectopic pregnancy.  Princess refused further treatment and examination and was released from the emergency room.

At 10:25 that evening, an ambulance brought Princess to the emergency room at Baptist Memorial Hospital in DeSoto, Mississippi.  Princess was accompanied by her fiancé, and was again suffering from nausea and vomiting.  According to Princess's fiancé, after being discharged from the hospital Princess had complained that she "did not want a baby," and began to lay on the ground and scream, "I want to be dead."  Princess also admitted that she smoked marijuana and drank cough medicine containing codeine after leaving the hospital earlier that day.  Princess's fiancé also said that Princess had threatened to kill herself by overdosing on pills.

When Princess arrived at the hospital, she was anxious but alert and answered questions appropriately.  As the evening progressed, however, she became agitated, pulled out her IV, disconnected herself from the monitor, and attempted to disrobe.  Princess became physical with emergency room staff and was restrained and given a dose of anti-anxiety medication.  Princess reported hallucinations, including a delusion that her two-month-old daughter was in the hallway.  (Princess has no children).

No. 15-60051

The attending emergency room physician reviewed Princess's treatment records and ordered a CT scan, an OB/GYN consult, and a psychiatric evaluation. Princess tested positive for marijuana and opiates. She was diagnosed with acute psychosis and a drug-induced reaction to an underlying psychiatric disorder. Brittany Hyman, an employee of Lakeside Behavioral Health, conducted a mental health evaluation and determined that Princess required psychological care for her psychosis. Princess refused voluntary admission, and the doctors planned to have her reevaluated for an involuntary commission. Her mother eventually consented to this process.

Hyman submitted an affidavit to the chancery court requesting that Princess be involuntarily committed for further evaluation because Princess posed a possible danger to herself and had refused voluntary admission. The court granted this request and ordered the DeSoto County sheriff to take custody of Princess. The chancery court subsequently learned that Princess was a resident of Marshall County and ordered the DeSoto County sheriff to transfer Princess to the sheriff of Marshall County.

On Tuesday, February 8, the hospital medically cleared Princess for release, and Princess was transported to the Marshall County jail. Upon arrival, DeSoto County deputies informed jail officer Adella Anderson[1] that Princess became agitated in transit and they had to restrain her. The deputies presented Officer Anderson with the order from the chancery court as well as Princess's medical records. Officer Anderson did not believe she was entitled to review Princess's medical records because she was not medical staff. She also chose not to look at the attached affidavit, which also described Princess's condition. As a result of these two choices, Officer Anderson never learned the details of Princess's medical condition. She attempted to talk with Princess

---

[1] Officer Anderson is unrelated to Angela and Princess Anderson.

during the initial intake procedures regarding Princess's medical history in order to complete the intake forms, but Princess did not answer. Princess was otherwise pleasant and did not seem agitated. Officer Anderson booked Princess into the jail, placed her in a single occupancy cell, and removed her handcuffs. Inmates testified that Princess was "real sweet and nice" and seemed "fine" on Tuesday afternoon, but that later that night, Princess began beating the walls and acting erratic. One of the inmates asked jail officers to return Princess to the hospital because her medical condition seemed to be getting worse.

On Wednesday, February 9, Princess's mother submitted an affidavit, filed with the Marshall County chancery court, stating that Princess kept "repeating every sentence" and telling "everyone she is real high, lay[ing] on the ground outside and say[ing] she's dying." Based on this affidavit, the chancery court immediately issued an order directing issuance of a writ, and appointed an attorney to represent Princess during the course of the commitment proceedings. The chancery court also set a commitment hearing for two days later at 8:30 a.m. The jail staff arranged an initial prescreening psychological evaluation for later that day, to be conducted by Debra Shelton, a Communicare staff psychologist (Communicare is the local mental health facility). Jail staff also scheduled physician and psychologist evaluations with Communicare for the following day. That evening, Princess's mother visited the jail and, upon being escorted to Princess's cell by Officer Anderson, discovered Princess lying naked on the floor. Princess's mother and Officer Anderson entered the cell together to dress Princess and to clean the cell, which was littered with paper and foam cups. Princess's mother asked if she could give her daughter a blanket, but jail officers told her the blanket was prohibited because it could potentially be used for self-harm. They told her she could visit Princess the next day.

Mental health evaluator Debra Shelton also visited Princess on Wednesday. Shelton noted that Princess was unresponsive during her examination and was "too impaired to communicate." She observed that Princess seemed to be completely disassociated at the time of her evaluation, and that Princess was experiencing paranoid delusions. Shelton concluded that Princess was "in immediate danger of self-harm" and experiencing "psychosis." In her written evaluation, Shelton recommended that Princess be immediately hospitalized and be watched carefully until her hospitalization. Shelton did not remember whether she gave a copy of her evaluation to the jail, though the evidence suggests she did: the jail had a copy of her evaluation that lacked notes she added later. One of the inmates at the jail recalled Shelton informing one of the jailers that Princess should have been in a hospital.

That evening, Jailer Janice Rahman was on duty and checked on Princess around 9:15 p.m. Princess was yelling loudly in her cell and had blood on her fingers. Rahman washed the blood from Princess's hands, determined that Princess was not still bleeding, and concluded that she did not need further medical care at that time.

On Thursday, February 10, Princess was scheduled to be transported to the physician's and psychologist's office for the physical and mental examination jail staff had previously arranged. Because of a snowstorm, however, Communicare canceled the physician evaluation schedule for that day, and the chancery court continued the commitment hearing from February 11 to February 15. The storm also prevented Princess's mother from visiting Princess as she had previously arranged with jail staff. Instead of being evaluated, Princess spent all day in her cell.

Jannie Bogard, another inmate in the jail, testified that Princess spent all of Thursday lying on the floor and that she did not get up from the floor all day. Bogard testified that the other inmates informed jailers of Princess's

condition and pleaded with jailers to "do something," but that jailers responded that there was nothing they could do. Bogard also testified that the jailers did not come back to check on Princess at all throughout Thursday. Bogard said that there was blood on the door, on the walls, and the floor. Bogard and another inmate, Loretha Ayers, testified that Princess had what appeared to be seizure-like activity on Thursday. They both tried to call 911 through the pay phone, but 911 would not take their calls and hung up. Bogard and Ayers both relayed the information about Princess's apparently worsening medical condition to the jailers. According to Bogard and Ayers, the jailers came to the door, but did not go into Princess's cell.

Officer Anderson checked on Princess at 7:00 a.m. that morning, and found her naked and lying on the floor. Officer Anderson testified that Princess was able to get off the floor, but moved slower than she had the day before, her thighs appeared to be bruised, and she had a cut on her hand. Inmates reported to Officer Anderson that Princess had injured her hand by pushing and pulling the tray hole in the door, so Officer Anderson closed the tray hole and locked it to prevent Princess from hurting herself. Officer Anderson checked on Princess again at 11:00 a.m. and brought her food to eat for lunch. Princess was nonresponsive, and was lying on the floor naked. Officer Anderson placed a blanket over her at this time. Officer Anderson also put ice on the redness and bruising on Princess's thighs. At 1:15 p.m., Officer Anderson checked on Princess again and found her nonresponsive and standing in the window of her cell naked. This was the last time Officer Anderson reported seeing Princess on Thursday.

On the morning of Friday, February 11, Angela Anderson went to the Marshall County courthouse to speak with the chancery court judge about her daughter's hospital treatment records, which reflected that Princess possibly had an ectopic pregnancy and needed a follow-up ultrasound test. The

No. 15-60051

chancery court contacted Lakeside personnel regarding the possibility of issuing a general release; Lakeside recommended against releasing Princess. The chancery court judge therefore issued a limited order permitting Angela Anderson to transport her daughter to the local hospital for a follow-up ultrasound.  Angela Anderson went to the jail to retrieve Princess to take her to the hospital.  When jail staff took Angela Anderson to Princess's cell, they found her lying on the floor in approximately two inches of water, feces, and vomit.  There was blood on the wall, and Princess's urine was black.  Princess's fingertips were bloody and were missing fingernails, and her legs were bruised.  Princess was unresponsive.

At this point, Officer Anderson called 911.  Paramedics arrived, and took Princess to Baptist Hospital Union, where she was admitted to the intensive care unit.  One of the emergency physicians who treated Princess at Baptist Union testified that she "may very well have been one of the sickest patients [he had] ever seen."  Princess passed away from multisystem organ failure on March 15, 2011.  The medical examiner noted that her medical records showed an early pregnancy that at the time of the autopsy was not present and concluded that a miscarriage might have occurred during Princess's confinement.

Angela Anderson filed this suit against the hospital that had initially released Princess, Marshall County, and the county sheriff, on behalf of herself and her deceased daughter, Princess.  Anderson asserted state law medical malpractice claims against the hospital, and asserted 42 U.S.C. § 1983 claims against the county and the sheriff, alleging that the county and sheriff were deliberately indifferent to Princess's serious medical needs in violation of the Eighth and Fourteenth Amendments, and that such deliberate indifference was the proximate cause of Princess's death.  The district court dismissed the claims against the sheriff on qualified immunity grounds.  The county filed a

7

No. 15-60051

motion for summary judgment, which the district court granted. After dismissing Anderson's claims against the county, the court declined to exercise supplemental jurisdiction over Anderson's state law claims against the hospital, and thus dismissed Anderson's state law claims without prejudice. Anderson timely appealed.

## II.

We review the district court's grant of summary judgment de novo, and construe all disputed facts in the light most favorable to the non-movant. *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). We will affirm summary judgment only if there is no genuine dispute about any fact that is material to determining liability. Fed. R. Civ. P. 56(a).

The facts recounted above, read in the light most favorable to the plaintiff, depict negligence on the part of Officer Anderson. As the plaintiff's version of the facts recounts, Officer Anderson is alleged to have been negligent by failing to fully inform herself about Princess's medical condition by reading the committal affidavit; she was further negligent when she failed to call for help when she saw (and heard from other inmates) that Princess's condition had rapidly worsened. Negligence by Officer Anderson, however, is not enough to establish liability on the part of Marshall County.

Holding Marshall County liable for Princess's death "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)). This type of municipal liability—known as *Monell* liability after the case that first recognized it—is difficult to prove. This difficulty arises because, unlike private companies, municipalities are not liable for negligent actions their employees take. Instead, they are liable only if the policymakers themselves were involved in the

8

unconstitutional acts. This difficulty reflects an intentional congressional choice to limit the scope of municipal liability.

In an attempt to clear this high bar, Anderson advances three arguments. First, Anderson argues that Marshall County had an unconstitutional policy of refusing to review inmate medical records and refusing to maintain access to a responsible physician. Second, Anderson argues that the county had an unconstitutional policy of operating jails with inadequate medical facilities and inadequately trained staff. Third and finally, Anderson argues that the county had a policy of inadequately training the existing jail staff. We address each argument in turn.

## III.

Anderson argues that Marshall County had a policy of forbidding jail staff from reading inmates' medical files, citing Officer Anderson's testimony that she did not read Princess's file because she was not a medical professional. Even if such a policy existed, however, it could not have been the moving force behind a violation of Princess's constitutional rights when, as the plaintiff admits, Officer Anderson "made the independent determination" (as opposed to following a policy) not to read more than the front page of Princess's commitment papers. Appellant's Br. at 16. Furthermore, if Officer Anderson had read the full commitment papers, she would have had the same relevant information contained in Princess's medical records. In fact, she would have had that information in a format better suited to comprehension by a layperson. Thus, the alleged policy against reading the medical file was not shown to have a causal connection to Officer Anderson's alleged lack of knowledge about Princess's condition.

Anderson next argues that Marshall County had a policy of incarcerating inmates in jails that lack both sufficient medical facilities and access to doctors. This argument is equivalent to arguing that Princess was subject to

"unconstitutional conditions of confinement." *See Edler v. Hockley Cty. Comm'rs Ct.*, 589 F. App'x 664, 668 (5th Cir. 2014). To prove that conditions of confinement were unconstitutional, plaintiffs must show "(1) a rule or restriction, an intended condition or practice, or a *de facto* policy as evidenced by sufficiently extended or pervasive acts of jail officials, (2) not reasonably related to a legitimate governmental objective, and (3) that violated [the detainee's] constitutional rights." *Id*. In this case, to satisfy prong two, Anderson must show that the jail's lack of on-site medical facilities is not reasonably related to a legitimate government interest. Anderson has presented no evidence on this point, and thus has not carried her burden. Moreover, Marshall County had a legitimate interest in both inmate safety and fiscal prudence. Absent contrary evidence, the county can validly balance these interests against each other by adopting a policy of calling for outside doctors instead of relying on in-house medical professionals. Because Anderson did not satisfy prong two, her unconstitutional confinement claim fails and we need not address the other prongs of the analysis.

Finally, Anderson argues that Marshall County failed to adequately train jail staff in how to handle emergency medical situations. Even within the difficult world of *Monell* liability, failure-to-train claims are especially difficult to establish. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). To successfully prove failure to train, Anderson must prove (1) that Marshall County failed to train Officer Anderson; (2) that this training failure directly caused Princess's injuries; and (3) that Marshall County displayed deliberate indifference in adopting those inadequate training polices. We will assume, without deciding, that Marshall County failed to adequately train Officer Anderson to properly respond to the instant situation.

No. 15-60051

To show that inadequate training caused Princess's injuries, Anderson presents evidence that Shelton, the mental health professional who evaluated Princess at the jail, told one of the jailers that Princess needed to be placed in a hospital on Wednesday; that, throughout Thursday, Princess was lying on the floor and did not get up from the floor all day; that there was blood on the walls and floor of Princess's cell; that Princess appeared to have seizure-like activity on Thursday; and that despite the fact that the inmates informed the jailers of Princess's condition and pleaded with them to do something, the jailers responded that there was nothing they could do.  Anderson also presented evidence that despite inmates urging that the jailers obtain medical care for Princess, the jailers did not check on Princess throughout the entire day on Thursday, February 10.  Finally, there is evidence that although the jailers did eventually summon an ambulance to take Princess to a hospital on Friday, February 11, they did so only after Angela Anderson, Princess's mother, arrived at the jail to take Princess to the local hospital for a follow-up ultrasound test.  Based on this evidence, we also assume, without deciding, that inadequate training caused jail staff to unconstitutionally deprive Princess of essential medical care.

Anderson does not, however, establish that Marshall County was deliberately indifferent to the constitutional rights of its inmates in adopting its training procedures.  Deliberate indifference can be proven in two ways.  First, plaintiffs can show that a pattern of similar incidents put the municipality on notice that its training was producing unconstitutional results.  *See Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).  Anderson presents no such pattern evidence here.  Or, second, plaintiffs can show that the "single incident exception" applies, in which case proving a pattern is unnecessary.  This showing is extremely difficult.  "[T]he possibility of single-incident liability based on a failure to train is rare, and . . . a single

11

incident is usually insufficient to demonstrate deliberate indifference." *Walker v. Upshaw*, 515 F. App'x 334, 341 (5th Cir. 2013). To qualify for the single incident exception, Anderson must show that Marshall County's training was so inadequate that the county should have predicted that an untrained officer would have neglected Princess in the way Officer Anderson allegedly did. Importantly, "[i]t is not enough to say that more or different training or supervision would have prevented" Princess's injuries. *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375 (5th Cir. 2005). More specificity is required to resolve such a claim.

The plaintiff's own evidence, however, cuts strongly against her argument. Reading the facts most favorably to the plaintiff, Princess was in obvious distress Wednesday and Thursday. Indeed, her fellow inmates—without any training—recognized that Princess should be hospitalized. According to the plaintiff, Officer Anderson was aware that Shelton recommended that Princess be transferred to a hospital. And it is undisputed that Officer Anderson was trained to contact a first responder in a medical emergency. Thus, reading the facts in the light most favorable to the plaintiff, Marshall County could not have anticipated that Officer Anderson and the other correctional officers would ignore Princess' litany of obvious aliments. Officer Anderson should have known to call a first responder, even without additional training. Marshall County could reasonably expect correctional officers, including Officer Anderson, to call for help when help is obviously required. Marshal County had no reason to predict that Officer Anderson required specialized training to reach this basic threshold.[2] But this degree of

---

[2] We also note that Officer Anderson had received at least some medical-assistance training. Thus, the case before us is not one of *failure* to provide medical training but instead of (alleged) *inadequate* medical training. This increases the difficulty of the task confronting the plaintiff. *See Estate of Davis*, 406 F.3d at 385–86 ("[T]here is a difference between a complete failure to train . . . and a failure to train in one limited area.").

No. 15-60051

predictability is exactly what Anderson must show to hold Marshall County liable under the single incident exception.

Anderson cannot meet the high bar required for *Monell* liability under any of the theories of liability she advances.  The district court therefore did not err in granting summary judgment against Anderson's § 1983 claims. Accordingly, we affirm the grant of summary judgement.

## IV.

Having concluded that the district court correctly granted summary judgment, we turn to the question of supplemental jurisdiction and whether the district court erred in dismissing the remaining state claims.  28 U.S.C. § 1367 permits a district court to decline to exercise supplemental jurisdiction when the court has dismissed all claims over which it had original jurisdiction. This court reviews a district court's decision to do so for an abuse of discretion. *See Enochs v. Lampasas Cty.*, 641 F.3d 155, 158–59 (5th Cir. 2011).  Section 1367 explicitly authorizes a court to decline to exercise supplemental jurisdiction over state law claims where the district court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367.  Here, the district court had dismissed all claims over which it had original jurisdiction. Further, the district court had not devoted significant judicial resources to the state law claims or become "intimately familiar" with Anderson's state law arguments.  *See Batiste v. Island Records Inc.*, 179 F.3d 217, 228 (5th Cir. 1999).  Thus, the district court did not abuse its discretion by declining to exercise its supplemental jurisdiction.  Accordingly, we affirm.

13

No. 15-60051

V.

The death of Princess was ignoble, sordid, upsetting, and tragic. The specific question before us, however, is only whether Angela Anderson has stated a valid cause of action against Marshall County under § 1983. Because Anderson did not clear that high legal burden, the judgment of the district court is

AFFIRMED.